## GUARDIANSHIP OF JANE DOE.

Barnstable. January 12, 1984. — April 3, 1984.

Present: HENNESSEY, C.J., ABRAMS, NOLAN, LYNCH, & O'CONNOR, JJ.

*Practice Civil,* Commitment of mentally ill person, Appointment of guardian. *Guardian,* Incompetent person, Consent to medical treatment. *Mental Health.*

An order of a Probate Court appointing a permanent guardian for a mentally ill person was invalid for failure to provide the ward with notice as required by G. L. c. 201, § 7, where the only notice given to the ward was of a hearing with respect to the appointment of a temporary guardian. [619-620]

An order of a Probate Court appointing a temporary guardian under G. L. c. 201, § 14, for a mentally ill person was invalid where the ward was not present at the hearing preceding the appointment and where the judge made no findings of extraordinary circumstances justifying the ward's absence. [620-621]

Commitment of a mentally ill person under the temporary guardianship provisions of G. L. c. 201, § 14, is authorized only upon specific written findings by a probate judge that the situation is so extreme an emergency that the commitment procedures of c. 123, § 12, are inadequate. [621]

General Laws c. 201, § 14, as interpreted by this court to permit commitment of a mentally ill person only in emergencies when the commitment procedures of c. 123, § 12, cannot be followed, is not unconstitutional. [622]

PETITION filed in the Barnstable Division of the Probate and Family Court Department on January 4, 1983.

Orders appointing a temporary guardian were made by *Lewis* J., and *Harvey,* J. An order appointing a permanent guardian was made by *Farrell,* J.

The Supreme Judicial Court granted a request for direct appellate review.

*Richard Cole* (*Helene Gerstle* with him) for the ward.

*Robert H. Weber,* for Mental Health Legal Advisors Committee, amicus curiae, submitted a brief.

LYNCH, J. On December 28, 1982, the ward was involuntarily committed to Bournewood Hospital (Bournewood), and in January, 1983, the Probate Court entered an order appointing

the ward's father temporary guardian. She was still in the hospital[1] on August 17, 1983, when the Probate Court appointed the ward's father permanent guardian.

The petition for involuntary commitment in this case was not filed under the provisions of G. L. c. 123,[2] but under an alternative commitment procedure, G. L. c. 201, § 14. This statute empowers the Probate Court to appoint temporary guardians with authority to commit and treat their wards. The commitment procedure of G. L. c. 201 specifically provides some, but not all, of the procedural protections of G. L. c. 123. The ward challenges the guardianship orders of the Probate Court on two bases. She argues that commitment pursuant to G. L. c. 201, § 14, is unconstitutional, because it violates her rights to due process and equal protection of the laws and that, even if G. L. c. 201, § 14, is constitutional, the Probate Court did not comply with it in this case. We agree that the guardianship orders in this case were invalid and we conclude that G. L. c. 201, § 14, as we interpret it, is not unconstitutional.

The facts and procedural background of the case are summarized from the transcript of the hearing of June 20 and June 21, 1983, on the motion for temporary guardianship in the Probate Court, and the findings of the judge.[3] The ward is a twenty-eight year old woman with a history of psychological problems. At the time of the hearing in June, 1983, she was diagnosed as suffering from chronic schizophrenia. Prior to her admission to Bournewood in December, 1982, she had been hospitalized three times.[4] She has been treated intermit-

---

[1] She had been transferred from Bournewood in Brookline to the Pocasset Mental Health Center (Pocasset) on Cape Cod.

[2] General Laws c. 123, §§ 1-55, as appearing in St. 1970, c. 888, § 4. This amendment to the Mental Health Code has been characterized as "one of the most comprehensive statutory housecleanings in modern history." Flaschner, The New Massachusetts Mental Health Code — A "Magna Carta" or A Magna Maze, 56 Mass. L.Q. 49, 60 (1971).

[3] Additional facts will be presented as required in our discussion of the issues.

[4] These three occasions involved five different hospitals. In the summer of 1975, she was committed to Frankfort General Hospital in Germany, then transferred to Walter Reed Hospital in Washington, D.C., and finally

tently with antipsychotic drugs for the past nine years[5] and has taken other drugs simultaneously, either to enhance the therapeutic effect of the antipychotic drug or, more often, to prevent or ameliorate the serious side effects of those drugs.[6]

Since 1975, when she was not hospitalized the ward lived either with her parents, with friends, or at a boarding house. She completed two semesters at Orange County Community College, where she received average grades. During the summer of 1977, she worked as a night bookkeeper, maid, and telephone operator at a hotel in New Paltz, New York.

In December, 1982, she was living at home with her parents. On December 28, her parents admitted her to Bournewood for ten days pursuant to G. L. c. 123, § 12.[7] On January 6, 1983, a

transferred to West Point in New York. Her second hospitalization was in Fallkirk, a private hospital in New York, from September, 1977, through February, 1978. Then, in June, 1978, she was hospitalized in Middletown State Hospital in New York.

[5] "Antipsychotic" drugs are "medications such as Thorazine, Mellaril, Prolixin, and Haldol that are used in treating psychoses, particularly schizophrenia." *Rogers* v. *Okin*, 634 F.2d 650, 653 n.1 (1st Cir. 1980), vacated and remanded sub nom. *Mills* v. *Roger*, 457 U.S. 291 (1982). The ward's treatment primarily has been with Haldol, though while at Pocasset Prolixin was her regular medication. See *Rogers* v. *Commissioner of the Dep't of Mental Health*, 390 Mass. 489 (1984).

[6] For example, while at Pocasset, she was taking Lithium Carbonate in combination with Prolixin to increase its therapeutic value. She was also receiving Cogentin, a drug which counteracts the side effects of Prolixin. The common side effects of Prolixin are dystonia or tardive dyskinesia, which are manifested by spasmodic twitching of the shoulder muscles, spasms of the face, rhythmic spastic movements of the lips and tongue, and spastic torticollis (some of the neck muscles are abnormally distorted, so that the neck is bent and the head titled toward one shoulder or the other). Martin, Hazards of Medication 360 (1971). These side effects can be so unpleasant that the patient will want to stop the Prolixin medication altogether.

[7] General Laws c. 123, § 12(a), as amended through St. 1982, c. 614, § 12, provides in pertinent part: "Any physician . . . or a qualified psychologist . . . after examining a person has reason to believe that failure to hospitalize such person would create a likelihood of serious harm by reason of mental illness may restrain or authorize the restraint of such person and apply for the hospitalization for a ten day period . . . at a private facility . . . . If an examination is not possible because of the emergency nature of the case and because of the refusal of the person to consent to such examination, the physician or qualified psychologist, on the basis of

judge in the Probate Court in Barnstable County appointed the
ward's father temporary guardian with the authority to treat
and commit the ward to a mental health facility. This order
was granted solely on the basis of the medical certificate of
her previous physician and an affidavit of her mother. No
witnesses were heard. The order was effective for ninety days
and, pursuant to it, the ward was committed to Bournewood
for ninety days. She was not notified of this proceeding either
before or after her commitment. Notice of the appointment
was published in the Cape Cod News, in Barnstable (while
the ward was in Brookline at Bournewood). She first learned
that her father had been appointed guardian when her doctor
told her she was to receive electro-convulsive shock treatments
(ECT). At that point, on or about February 14, she found an
attorney to help her oppose the treatment. On March 4, 1983,
the judge appointed a guardian ad litem, and also appointed
the attorney as counsel. On March 15, a second motion for
appointment of a temporary guardian, this time expressly in-
cluding the authority to treat with ECT, was heard by the
Probate Court. The ward was present at this hearing. Due to
scheduling problems, the hearing was continued before she
had presented her defense and, in fact, before her father had
completed presentation of his case. The judge granted the
petition for temporary guardianship on March 15. He also
entered an order on April 8, appointing the ward's father per-
manent guardian nunc pro tunc to March 15. These two orders
were revoked on April 26, and the judge ordered that a de
novo hearing on the petition for temporary guardianship be
held, but pending that hearing he entered a new temporary
guardianship order. On May 20, the parties agreed to continue
the temporary guardianship until no later than June 24. The
ward agreed to extend the guardianship because her improve-
ment made it likely that she would be discharged to an outpa-
tient setting, because her father promised not to seek authority
to treat with ECT, and because her Prolixin medication was

---

the facts and circumstances, may determine that hospitalization is necessary
and may apply therefor." It is unclear from the record whether the ward
was examined prior to her admission. It is clear, however, that the admission
was against her will.

to be reduced. She was not discharged, however, and on June 20 and 21, the petition for temporary guardianship was heard. The judge extended the temporary guardianship ordered on April 26 until he should render a decision. On August 17, the judge issued an order that the ward's father be appointed *permanent* guardian for his daughter, that he have the authority to admit her to a mental health facility, and that he have the right to authorize treatment, including the administration of the anitpsychotic drug Prolixin. From start to finish, this whole process took almost eight months.

After the ward's motion to vacate the August 17 order was denied in the Probate Court, she appealed to the Appeals Court, where her motion to stay the decree of permanent guardianship was granted, for the reason "that the decree appears to be erroneous due to a lack of compliance with statutorily mandated notice requirements." The ward's application for direct appellate review of the guardianship orders was granted by this court. Neither the ward's parents nor the Attorney General appeared before this court.[8] Briefs were submitted by the ward and as amicus curiae by the Mental Health Legal Advisors Committee.

Our view of this case turns on two orders, both issued pursuant to G. L. c. 201, § 14: the order entered January 6, 1983, which appointed a temporary guardian with the authority to treat and commit, and the order entered on August 17, 1983, which appointed a permanent guardian, also with the authority to treat and commit. We hold that both orders were invalid.

1. The Attorney General's failure to appear in this action was based on a belief that the constitutional issues raised in the ward's appeal are moot either because the ward is no longer hospitalized or because of the Appeals Court's stay of the permanent guardianship order. As we have said before, issues which involve the rights of the mentally ill are classic examples of issues that are "capable of repetition, yet evading review." *Hashimi* v. *Kalil*, 388 Mass. 607, 609 (1983). *Superinten-*

---

[8] The ward's parents have stated they will proceed no further, either in the Probate Court or on appeal.

*dent of Worcester State Hosp.* v. *Hagberg,* 374 Mass. 271, 274 (1978). Because a temporary guardianship order is good only for ninety days, it is almost inevitable that such an order would expire before completion of the appellate process.[9] It is unnecessary to address the question of the mootness of the permanent order because it is indisputable that the validity of a statute which permits the Commonwealth to commit someone involuntarily to an institution is a question of public importance. *Hashimi* v. *Kalil, supra* at 609.

2. A single justice of the Appeals Court, in ruling on the ward's motion for a stay, suggested that the permanent guardianship order entered on August 17 was invalid because the ward was not provided with notice as required by G. L c. 201, § 7.[10] Failure to comply with G. L. c. 201, § 7, requires that a permanent guardianship order be invalidated. *Laurenza* v. *Laurenza,* 7 Mass. App. Ct. 906, 907 (1979). The Appeals Court single justice noted that the parties conceded and the judge in the Probate Court found that the only notice provided was of a hearing with respect to the appointment of a *temporary* guardian. The distinction between a hearing on temporary guardianship and one on permanent guardianship cannot be overlooked as a minor technicality. There are situations in which appointment of a temporary guardian is called for and situations in which appointment of a permanent guardian is more appropriate. Although there may be overlaps, the two functions are not interchangeable. Compare G. L. c. 201, § 6, with G. L. c. 201, § 14. Furthermore, a permanent guardianship order carries with it more serious implications for the prospective

---

[9] A temporary guardianship may be extended for an additional ninety days, Rule 29B of the Probate Courts, as amended (1982) (Rule 29B), but even 180 days would not be enough time to complete the normal appellate process. It is not our wish to encourage the issuance of successive commitment orders, rather it is to be hoped that the duration of involuntary orders for guardianship or commitment would be kept to a minimum, whether or not an appeal was pending.

[10] General Laws c. 201, § 7, as amended through St. 1974, c. 845, § 5, provides in pertinent part, that "the court shall cause not less than seven days' notice of the time and place appointed for the hearing to be given to the alleged mentally ill . . . person."

ward, particularly with respect to duration. The fact that the judge makes findings after a temporary guardianship hearing which would support the appointment of a permanent guardian cannot retroactively enlarge the scope of the hearing.

We feel compelled to add a word about the fact that the final order of the Probate Court was issued five months after the initial hearing. Although we understand that litigation of any kind is prone to delays, a delay of this length in the context of a commitment proceeding is unacceptable. Proceedings which determine whether a person is to be confined to a mental hospital should be resolved with the utmost dispatch, as the requirements for expeditious action of G. L. c. 123, §§ 7 and 12, demonstrate.

3. The order appointing a temporary guardian entered January 6 was also invalid. This order was not considered by the single justice of the Appeals Court, presumably because it had expired by its own terms ninety days after entry. As we noted above, however, a temporary order by its very nature would be insulated from appellate review if the doctrine of mootness were literally applied. This temporary order is also invalid for lack of notice. It was issued pursuant to G. L. c. 201, § 14. Although that section does not require that the court give the prospective ward notice that petition for guardianship has been filed,[11] it does require that she be present at the hearing, absent a finding of extraordinary circumstances" (in which case her counsel must be present). No such finding was made and there appears in the record no reason for the ward's absence.

Extraordinary circumstances justifying the ward's absence are not enough, however, to justify such an order. For G. L. c. 201, § 14, also provides that the court can only authorize commitment or treatment of the ward in an ex parte proceeding "in cases of extreme emergency . . . if it finds that the remedies under the emergency provisions of [G. L. c. 123, § 12] are not applicable or would not be available to deal with the present emergency."

---

[11] Rule 29B of the Probate Courts, as amended, states that written notice of a petition for guardianship shall be given to the ward at least seventy-two hours in advance, but the court may waive that requirement. A reading of the rule that permits waiver of notice in the absence of emergency or other compelling reasons renders the rule of doubtful validity.

The guardianship proceeding of G. L. c. 201, § 14, is not a substitute for the civil commitment proceeding of G. L. c. 123. Before a court can authorize treatment or commitment pursuant to G. L. c. 201, § 14, it must first find that the situation is so extreme that the emergency provisions of G. L. c. 123, § 12, will not suffice. In its decree or order the court must "indicate the nature of the emergency requiring such appointment and the particular harm sought to be avoided." G. L. c. 201, § 14. This requirement demonstrates that, while the Legislature intended G. L. c. 123, § 12, to be the primary route for civil commitment, it also recognized that there may be exceptional cases where immediate needs of the ward will require the emergency provisions of the guardianship procedure. This is not such a case. The judge in the Probate Court made no finding of extreme emergency and no basis for such a finding appears in the record. The judge did not find and, under the circumstances, could not have found that the provisions of c. 123, § 12, would not suffice.

4. Because the temporary guardianship order is no longer in effect and because the two orders were not entered in accordance with the provisions of G. L. c. 201, §§ 7 and 14, we need not resolve the ward's claims that the statutory scheme violates her rights to due process and equal protection of the laws. We note, however, that if the provisons of the statute as we have just described them are complied with, in particular if a temporary guardian is authorized to treat or commit a ward only upon specific written findings that there is so extreme an emergency that the procedures of G. L. c. 123, § 12, are not sufficient, no constitutional infirmity will result. Since G. L. c. 201, § 14, is only to be used when G. L. c. 123, § 12, cannot be, the application of the two statutes does not create an equal protection problem. Similarly, G. L. c. 201, § 14, as interpreted here, requires the presence of the ward except in extraordinary circumstances. When the ward cannot be present, she must be represented by counsel. When so intrpreted the guardianship statute is not deficient in a due process sense.

5. The ward makes numerous other arguments which call into question the validity of the proceeding in the Probate Court. For

instance, she argues that her father presented insufficient evidence to justify an order of commitment and that he failed to meet his burden of proving that appropriate less restrictive alternatives were unavailable in the community. In oral argument, she invited us to take this opportunity to fashion guidelines to aid lower courts in determining when sufficient evidence has been presented to justify commitment. In light of our holding today, which invalidates the temporary and permanent guardianship orders, we decline this invitation.

6. In conclusion, we hold that the temporary and permanent guardianship orders were not issued in accordance with the statutory provisions of G. L. c. 201, §§ 7 and 14, and therefore were invalid, and that as we interpret it G. L. c. 201, § 14, is not unconstitutional. The order appointing a permanent guardian is vacated.

*So ordered.*