BRUCE M. COHEN & another[1] *vs.* HELEN BOLDUC.

Middlesex. September 7, 2001. - January 11, 2002.

Present: MARSHALL, C.J., GREANEY, IRELAND, SPINA, COWIN, SOSMAN, & CORDY, JJ.

*Health Care Facility. Mental Health. Incompetent Person,* Consent to medical treatment. *Practice, Civil,* Commitment of mentally ill person.

Discussion of legislation in various States permitting individuals to give advance directives for health care decisions should they become incapable of communicating their own wishes. [613-615]

This court concluded that, absent an express limitation by the principal in a health care proxy itself, the Massachusetts health care proxy statute, G. L. c. 201D, does not prevent an agent from making the decision to commit the principal to a mental health care facility, provided the principal does not object [615-621], and that, if the principal does object, or revokes the proxy after it has been activated, the proxy statute provides that the agent has no further authority to make treatment decisions — including the commitment or retention of the principal at a mental health facility — without a court determination that the principal is incapacitated [621].

On a petition for involuntary commitment under G. L. c. 123, §§ 7 and 8, filed by a hospital seeking to retain a seventy-four year old patient at the hospital involuntarily, the judge, after finding that the patient was mentally ill and that failure to retain the patient at the hospital would create a likelihood of serious harm, did not err in denying the patient's motion to dismiss the petition, where there was no basis to conclude that the involuntary commitment was improper. [621-622]

PETITION filed in the Cambridge Division of the District Court Department on August 9, 2000.

A motion to dismiss was heard by *Thomas M. Brennan,* J., and the case was heard by him.

The Supreme Judicial Court granted an application for direct appellate review.

*Diane M. Geraghty* for McLean Hospital.

*Nadell Hill* for the defendant.

MARSHALL, C.J. We have been asked to determine whether the

---

[1]McLean Hospital.

Massachusetts health care proxy statute, G. L. c. 201D (proxy statute), authorizes a proxy agent to commit a principal to a mental health facility. The question arises because the proxy statute does not address the issue directly, and commitment to such a facility, unless voluntary, produces a loss of freedom as well as the stigma of mental illness. See *Doe* v. *Doe*, 377 Mass. 272, 280-281 (1979); *Superintendent of Worcester State Hosp.* v. *Hagberg*, 374 Mass. 271, 276 (1978). We conclude that, absent an express limitation by the principal in the health care proxy itself, the proxy statute does not prevent an agent from making that treatment decision, provided the principal does not object. If the principal objects, or if she revokes her proxy after it has been activated, the proxy statute provides that the agent has no further authority to make treatment decisions — including the commitment or retention of the principal at a mental health facility — without a court determination that the principal is incapacitated. See G. L. c. 201D, § 6, sixth par., § 7, second par.

In this case the hospital sought to commit the objecting principal under G. L. c. 123, §§ 7 and 8, the involuntary commitment statute, whereupon a judge in the Probate and Family Court made a determination that commitment was in the best interests of the principal and that there was a likelihood of serious harm if she was not committed. G. L. c. 123, § 12 (*d*). There is therefore no basis on which to conclude that the involuntary commitment of the principal in this case was improper. We need not and do not decide whether, had a judicial determination been sought and obtained that the principal was incapacitated (G. L. c. 201D, § 6), commitment by the agent over the principal's objection would have contravened the requirements of G. L. c. 201D, G. L. c. 123, §§ 7 and 8 (involuntary commitment), or any other provision of law.

1. *Background.* In 1998, Helen Bolduc, then seventy-four years old, executed a prototypical health care proxy, in which she authorized her daughter, as her agent, to make health care decisions on her behalf in the event she was unable to consent to them. Bolduc's health care proxy provided, in relevant part:

"My Health Care Agent is granted full power and

authority to consent to any and all medical treatment which I may need in the event that I am unable to consent to such treatment on my own including without limitation authority to consent for medical care, hospitalization, nursing home admission, or whatever else may in my Health Care Agent's sole judgment be in my best interest . . . . I further state to all the world that there are no limitations imposed upon my Health Care Agent's authority."

By its express terms, the proxy placed no limitations on the authority of Bolduc's agent.

In June, 2000, the proxy was activated while Bolduc was a resident of the Forestview Nursing Home in Warren. Her attending psychiatrist determined that she was suffering from auditory hallucinations and paranoid and psychotic thought, and that she lacked the capacity to make or communicate health care decisions, the proxy's triggering event. She was admitted to McLean Hospital (hospital) under the emergency hospitalization procedures specified in G. L. c. 123, § 12 (a).[2] Her attending psychiatrist entered in Bolduc's record his determination that she was incapable of making or communicating health care decisions, thereby activating the proxy. See G. L. c. 201D, § 6. On July 2, Bolduc's daughter, acting as her health care proxy agent, converted Bolduc's status at the hospital to "conditional voluntary" by executing on Bolduc's behalf an application for "conditional voluntary" admission, which was accepted.[3] See

---

[2]General Laws c. 123, § 12 (a), provides in pertinent part: "Any physician who is licensed pursuant to [G. L. c. 112, § 2] or qualified psychiatric nurse mental health clinical specialist authorized to practice as such . . . or a qualified psychologist . . . who after examining a person has reason to believe that failure to hospitalize such person would create a likelihood of serious harm by reason of mental illness may restrain or authorize the restraint of such person and apply for the hospitalization of such person for a four day period at a public facility or at a private facility authorized for such purposes by the [Department of Mental Health]."

[3]A guardianship petition was also filed in the Probate and Family Court Department and on July 25, 2000, a judge appointed Bolduc's two daughters (one of whom was her health care agent) as her temporary guardians with the authority to monitor the administration of antipsychotic medication. The order did not authorize the temporary guardians to admit Bolduc to a mental health facility. See G. L. c. 201, § 6.

G. L. c. 123, § 12 (c).[4] Under "conditional voluntary" status there were no temporal limits on Bolduc's confinement. See G. L. c. 123, § 10.[5] Had her agent not converted Bolduc's status, the hospital would have been required to file a petition to retain Bolduc on an involuntary basis within ten (now four) days of Bolduc's emergency admission. See G. L. c. 123, § 12 (d), inserted by St. 1986, c. 599, § 38.[6]

On August 7, Bolduc executed a written revocation of her proxy, and indicated her intention to leave the hospital.[7] The record does not reveal the circumstances that triggered Bolduc's action. Two days later the hospital filed in the Cambridge Division of the District Court Department a petition for involuntary

---

[4]General Laws c. 123, § 12 (c), provides: "No person shall be admitted to a facility under the provisions of this section unless he, or his parent or legal guardian in his behalf, is given an opportunity to apply for voluntary admission under the provisions of paragraph (a) of section ten . . . ."

[5]General Laws c. 123, § 10, provides that a person "in need of care and treatment" may be voluntarily admitted to any "facility . . . suitable for such care and treatment" on application: "(1) by a person who has attained the age of sixteen, (2) by a parent or guardian of a person on behalf of a person under the age of eighteen years, and (3) by the guardian of a person on behalf of a person under his guardianship." The regulation governing eligibility for voluntary or conditional voluntary admission states that "a person must be competent to apply for such admission, and desirous of receiving treatment." 104 Code Mass. Regs. § 27.06(1)(b) (1997). "[C]ompetent means: . . . that a patient admitted on a conditional voluntary status understands that he or she is in a facility for treatment, understands the three-day notice provisions, and understands the facility director's right to file a petition for commitment and thereby retain him or her at the facility." 104 Code Mass. Regs. § 27.06(1)(d)(2) (1997).

[6]In June, 2000, when Bolduc was admitted to McLean Hospital (hospital), G. L. c. 123, § 12, permitted an emergency hospitalization for a period of up to ten days. See G. L. c. 123, § 12, inserted by St. 1986, c. 599, § 38. The Legislature has since amended that section, which now limits emergency hospitalization to four days. See G. L. c. 123, § 12 (d), as amended by St. 2000, c. 249, § 5 (effective Nov. 11, 2000).

[7]The revocation consisted of two sentences: "I, Helen Bolduc, do hereby revoke any and all Health Care Proxies that I may have executed in the past. I want to leave the hospital." The hospital treated Bolduc's statement as a three-day notice of termination of her "conditional voluntary" admission status. See G. L. c. 123, § 11. The hospital was correct to do so. Title 104 Code Mass. Regs. § 27.06(5) (1997) provides: "The form and content of [the] three day notice . . . shall be deemed sufficient so long as it conveys the patient's intention, without requirement that it be on any particular form of the facility."

commitment under G. L. c. 123, §§ 7 and 8, seeking to retain Bolduc at the hospital involuntarily.[8,9]

Bolduc filed a motion to dismiss the hospital's petition on the ground that it was not timely filed. She claimed that her agent lacked the authority under the proxy to convert Bolduc's status at the hospital to "conditional voluntary," and that the hospital's petition for involuntary commitment was therefore beyond the ten-day period within which to file a petition. G. L. c. 123, § 12 (*d*). See note 6, *supra.* The motion judge disagreed and, after a hearing, found that Bolduc was mentally ill and that failure to retain her at the hospital would create a likelihood of serious harm.[10] He denied Bolduc's motion to dismiss, and entered a six-month order of commitment. Bolduc filed an expedited appeal to the Appellate Division of the District Court Department. See Dist./Mun. Cts. Appellate Division Appeal Rule 8A (West 2001).

Prior to oral argument before the Appellate Division, Bolduc was discharged from the hospital. The Appellate Division held that Bolduc's challenge to the order of commitment and the issues raised by her were moot, but addressed the merits of the claims as concerning matters of public importance "capable of repetition, yet evading review." *Acting Supt. of Bournewood Hosp.* v. *Baker*, 431 Mass. 101, 103 (2000), quoting *Guardianship of Doe*, 391 Mass. 614, 618 (1984). The Appellate Division agreed with the motion judge and dismissed Bolduc's appeal. Bolduc appealed, and we granted her application for

---

[8]General Laws c. 123, § 7, provides in relevant part: "The superintendent of a facility may petition the district court . . . in whose jurisdiction the facility is located for the commitment to said facility and retention of any patient at said facility whom said superintendent determines that the failure to hospitalize would create a likelihood of serious harm by reason of mental illness."

[9]General Laws c. 123, § 8, provides in relevant part: "After a hearing, unless such hearing is waived in writing, the district court . . . shall not order the commitment of a person at a facility or shall not renew such order unless it finds after a hearing that (1) such person is mentally ill, and (2) the discharge of such person from a facility would create a likelihood of serious harm."

[10]The judge signed a preprinted form ordering Bolduc's commitment for six months. Implicit in his order is a finding that failure to retain Bolduc at the hospital would present a likelihood of serious harm, although the judge did not so indicate in a section of the form that provides for that determination.

direct appellate review. We affirm the order of the motion judge denying Bolduc's motion to dismiss.

2. *Commitment to a mental health facility where the principal does not object to treatment.* In response to advances in medical technology that have made it possible to maintain and prolong life in circumstances previously not possible, every State has enacted legislation permitting individuals to give advance directives for health care decisions should they become incapable of communicating their own wishes.[11] First adopted in 1990, St. 1990, c. 332, § 1, the Massachusetts proxy statute, entitled, "An Act providing for the execution of health care proxies by individuals," reflects one of several approaches to the subject. Written in broad terms, it allows an appointed agent to make "any and all health care decisions" if granted such authority by a principal.[12] G. L. c. 201D, § 5. Advance directive statutes can apply to physical or mental conditions, or (as in Massachusetts) to both. G. L. c. 201D, §§ 1, 5. One aspect of mental health treatment — whether an advance directive should convey the authority to commit a principal to a mental health facility — has been the subject of some debate among commentators,[13] is the subject of a uniform law promulgated by the National

---

[11]Advance directive statutes are intended to permit and maximize personal control over health care decision-making, which includes permitting individuals to express their health care desires in a manner that will be respected when they are no longer able to do so. A helpful (but no longer current) summary of the advance directive statutes enacted in all States is contained in Fleischner, Advance Directives for Mental Health Care, 4 Psychol., Pub. Pol'y & L. 788, 796-804 (1998). The advantages of such statutes have also been recognized by Congress: 42 U.S.C. § 1395cc requires all health care providers receiving Medicare or Medicaid funds to inform all adult patients of their right to execute an advance directive concerning medical care. The Federal law also requires that health care providers educate their staff and the community about the law. See *id.*

[12]Unlike some States, the Massachusetts statute does not provide for instructional, as opposed to agent-delegated, advance directives, and has no "living will" provision.

[13]See, e.g., Winick, Advance Directive Instruments for Those with Mental Illness, 51 U. Miami L. Rev. 57, 81-85 (1996); Dresser, Ulysses and the Psychiatrists: A Legal and Policy Analysis of the Voluntary Commitment Contract, 16 Harv. C.R.-C.L. L. Rev. 777 (1982).

Conference of Commissioners on Uniform State Laws,[14] and has been regulated in different ways in different States. The Massachusetts proxy statute does not address the subject. In contrast, twenty-five other States have enacted statutes that do. Ten States allow advance directives for mental health treatment, but prohibit any commitment — voluntary or involuntary — by the agent.[15] Three States allowing such directives prohibit only involuntary commitment.[16] Eight States allow commitment only if expressly authorized by the principal in her proxy, in some cases for limited periods only.[17] Four other States permit a

[14]In 1993 the National Conference of Commissioners on Uniform State Laws promulgated the Uniform Health-Care Decisions Act, 9 (Part IB) U.L.A. 144 (Master ed. 1999), which some States have adopted in whole or in part. In 1999 the Commissioners amended § 13 of the Uniform Act to provide that the Act "does not authorize an agent or surrogate to consent to the admission of an individual to a mental health-care institution unless the individual's written advance health-care directive expressly so provides." *Id.* at § 13(e). The Commissioners added at the same time a section providing that the Act "does not affect other statutes of this State governing treatment for mental illness of an individual involuntarily committed" to a mental health care facility. *Id.* at § 13(f).

[15]See Cal. Prob. Code § 4652 (West Supp. 2001); Nev. Rev. Stat. § 449.850(1)(a) (2000); N.H. Rev. Stat. Ann. § 137-J:2(v)(a) (West 1996); Or. Rev. Stat. § 127.540(1) (1999); Tex. Health & Safety Code Ann. § 166.152(f)(1) (West 2001); Vt. Stat. Ann. tit. 14, § 3453(e) (1989); Va. Code Ann. § 54.1-2986(c) (Michie 1998); Wis. Stat. Ann. § 155.20(2) (West Supp. 2000); Wyo. Stat. Ann. § 3-5-205(a)(i) (Lexis Nexis 2001). Although North Dakota permits commitment for up to forty-five days, it does not allow consent to commitment for any greater period, regardless of whether the principal expressly authorized it. See N.D. Cent. Code § 23-06.5-03 (Lexis Nexis Supp. 2001).

[16]Alabama, Georgia, and Washington expressly prohibit the agent from "involuntar[il]y" committing the principal without following statutory procedures for involuntary commitment. See Ala. Code §§ 22-8A-4(2), 26-1-2 (Michie 1991); Ga. Code Ann. § 31-36-10 (Lexis 2001); Wash. Rev. Code Ann. §§ 11.92.043(5), 11.94.010(3) (West 1998). These statutes also prohibit the agent from making certain other decisions, for example convulsive treatment or psychosurgery. They appear implicitly to permit an agent to admit the principal under voluntary admission procedures.

[17]See Alaska Stat. §§ 13.26.344(l), 47.30.970 (Lexis 2000) (seventeen-day commitment permissible if expressly authorized by principal); Ariz. Rev. Stat. § 36-3283 (West Supp. 2000) (commitment permissible if expressly authorized); Fla. Stat. Ann. § 765.113(1) (West 1997) (commitment permissible if expressly authorized); Haw. Rev. Stat. § 327E-13(e) (Supp. 2000) (commitment permissible if expressly authorized); Ill. Comp. Stat. § 755/43-75 (West 2001) (seventeen-day commitment permissible if expressly

principal to authorize an agent to admit the principal to a mental health facility provided that the authority is conferred in a document separate from a general durable power of attorney concerning, for example, property or financial assets.[18] The statutes in the last two categories (notes 17 and 18, *supra*) are silent as to involuntary commitment and, to our knowledge, no court has sanctioned indefinite involuntary commitment to a mental health facility even where there is express statutory authorization for voluntary commitment. See note 14, *supra*.

Because the Massachusetts proxy statute does not address the issue, we must determine whether authority to commit is implicit in our statutory scheme.[19] Bolduc did not object to her

authorized), Kan. Stat. Ann. § 58-629(a)(2) (1994) (authority to "make all necessary arrangements for the principal at any hospital, psychiatric hospital or psychiatric treatment facility" may be expressly granted); Me. Rev. Stat. Ann. tit. 34-B, § 3831(6) (West 1998 & Supp. 2000) (commitment permissible if expressly authorized); Miss. Code Ann. § 41-41-227(5) (Lexis Nexis 2001) (commitment permissible if expressly authorized).

[18]See N.C. Gen. Stat. § 122C-73 (Lexis 1999) (principal may authorize "admission to and retention in a facility for the care or treatment of mental illness" in an "advance instruction for mental health treatment"); Okla. Stat. tit. 43A, §§ 11-104, 11-106 (Supp. 2000) (principal may authorize "inpatient mental health treatment" in an "advance directive for mental health treatment"); S.D. Codified Laws §§ 27A-16-1(7), 27A-16-3 (1999) (principal may authorize commitment of up to thirty days in a "power of attorney for mental illness treatment"); Utah Code Ann. §§ 62A-12-502, 62A-12-504 (Lexis 2000) (principal may authorize commitment of up to seventeen days in a "declaration for mental health treatment"). Minnesota allows a person to designate a "proxy" to make decisions about "intrusive mental health treatments," which include "electroshock therapy and neuroleptic medication." See Minn. Stat. § 253B.03(6) (2000). The statute does not specify whether authority to commit the principal to a mental health facility — voluntarily or otherwise — may be conferred.

[19]Bolduc has revoked her health care proxy and is no longer receiving treatment at the hospital. Both the order of civil commitment and the question whether Bolduc's agent had the authority to apply for conditional voluntary admission to the hospital on her behalf are therefore moot. *Globe Newspaper Co.* v. *Chief Med. Examiner*, 404 Mass. 132, 134 (1989). Any due process claim Bolduc may once have had is also moot because she received a full evidentiary hearing at her involuntary commitment proceeding pursuant to G. L. c. 123, §§ 7 and 8.

We consider the issues raised because the commitment and treatment of mentally ill persons are matters of public importance. Involuntary commitment to a mental health facility is often brief, and will seldom present an active controversy. See *Acting Supt. of Bournewood Hosp.* v. *Baker*, 431 Mass. 101, 103 (2000); *Hashimi* v. *Kalil*, 388 Mass. 607, 609 (1983). Because the

initial commitment to the hospital, and we consider first the agent's authority to act unopposed by her principal. General Laws c. 201D, § 2, provides that "[e]very competent adult shall have the right to appoint a health care agent by executing a health care proxy." Section 5 of the statute provides that an agent "shall have the authority to make any and all health care decisions on the principal's behalf that the principal could make, including decisions about life-sustaining treatment, subject, however, to any express limitations in the health care proxy." "Health care," in turn, is defined as "any treatment, service or procedure to diagnose or treat the physical *or mental condition* of a patient" (emphasis added). G. L. c. 201D, § 1. Bolduc argues that commitment to a mental health facility is beyond the scope of "treatment" as defined in the statute, and that the Legislature could not have intended to permit such commitment without a judicial finding in every case that failure to commit would create a likelihood of serious harm. We disagree with both propositions.

There is no indication in the proxy statute that the Legislature intended the scope of "treatment" to be limited. General Laws c. 201D, § 5, is sweeping in its scope — "any and all health care decisions." "Health care" is broadly defined, and does not limit an agent's authority regarding any particular areas of treatment. By referring specifically to the "mental condition" of a principal, the Legislature plainly contemplated an agent's authorizing some mental health treatments, again without limitation.[20] Other provisions of the statute suggest that commitment to a mental health facility is indeed within the contemplated authority of a health care agent. The conflict of interest provision of the statute is one such indication.

proxy statute does not provide explicit notice to a principal that commitment to such a facility may be conferred by proxy, the issue is likely to arise again in similar circumstances. See *Guardianship of Weedon*, 409 Mass. 196, 197 (1991); *Guardianship of Doe*, 391 Mass. 614, 618 (1984).

[20]See S.M. Dunphy, Probate Law and Practice § 44.3, at 189 (2d ed. 1997 & Supp. 2001) ("[§ 5] is a broad provision authorizing the agent to make ordinary and extraordinary medical treatment decisions for the principal including decisions about life itself. This authority would appear to include the authority to commit the principal to a mental health facility, to consent to the administration of antipsychotic medication and refuse medical treatment since they are each decisions that the principal could make").

Section 3 of the proxy statute prohibits the appointment of health care agents who may have a conflict of interest with a principal, defined as "operator[s], administrator[s] or employee[s]" of a "facility" at which the principal is a patient, resident, or applicant for admission when she executes the proxy.[21] G. L. c. 201D, § 3. "Facility" includes "any private, county or municipal facility . . . which offers . . . residential or day care services and is represented as providing treatment of persons who are mentally ill." G. L. c. 19, § 19.[22] Thus, the proxy statute explicitly restricts operators, administrators, or employees of a facility that provides "treatment of persons who are mentally ill" from acting as proxy agents.[23] The Legislature must surely have intended treatment at mental health facilities to come within the definition of health care "treatment," or the conflict of interest provisions as applied to persons who are mentally ill would be redundant. See *Hoffman* v. *Howmedica, Inc.*, 373 Mass. 32, 37 (1977) (statutory language principal source of insight into legislative purpose).

Denying a health care proxy agent the authority to commit her principal to a mental health facility would also frustrate the evident purpose of the proxy statute: to support and enhance patient autonomy, while ensuring the principal's control over her health care decisions. Every person has a "right" under the proxy statute to appoint a health care agent, who is granted the

[21]Operators, administrators, or employees of such facilities related by blood, marriage, or adoption to the principal are exempted from the restriction. G. L. c. 201D, § 3.

[22]General Laws c. 201D, § 1, defines "[f]acility" as "any facility as defined in [G. L. c. 111, § 70E]." That statute, in turn, defines "facility" as "any hospital, institution for the care of unwed mothers, clinic, infirmary maintained in a town, convalescent or nursing home, rest home, or charitable home for the aged, licensed or subject to licensing by the [Department of Public Health]; any state hospital operated by the department; any 'facility' as defined in [G. L. c. 111B, § 3]; *any private, county or municipal facility, department or ward which is licensed or subject to licensing by the department of mental health pursuant to section nineteen of chapter nineteen*; or by the department of mental retardation pursuant to [G. L. c. 19B, § 15]; any 'facility' as defined in [G. L. c. 123, § 1]; the Soldiers Home in Holyoke, the Soldiers' Home in Massachusetts; and any facility set forth in [G. L. c. 19, § 1,] or [G. L. c. 19B, § 1]" (emphasis added). G. L. c. 111, § 70E.

[23]The "superintendent" of a mental health facility is statutorily authorized to petition to commit or retain a patient at a facility. See note 8, *supra.*

authority to make health care decisions on her behalf as if she had made the decisions herself. G. L. c. 201D, § 2. The agent's decisions are to be made from the principal's perspective: they must be in accordance with an "assessment" of her "wishes," or, if her wishes are unknown, an "assessment" of her "best interests." G. L. c. 201D, § 5. Any decisions not expressly prohibited by the principal have the "same priority over decisions by any other person" as if the principal had made them. *Id.* The proxy statute thus ensures that a patient's right of autonomy and self-determination with regard to medical care is respected, even after she loses the capacity to make and communicate her wishes.[24] Restricting the range of choices available to a person who enters into a proxy arrangement would hinder the control over medical decision-making the statute seeks to foster. See G. L. c. 201D, § 4 (iii) (health care proxy shall "describe the limitation, if any, that the principal intends to impose upon the agent's authority").

Contrary to Bolduc's claim, permitting an agent to commit her principal to a mental health facility where the principal does not object is also consistent with our case law concerning the rights of incompetent patients with regard to health care decision-making.[25] Respect for patient autonomy does not end when a patient becomes incapable of making her own decisions.

---

[24]Cf. prefatory note to the Uniform Health-Care Decisions Act 9 (Part IB) U.L.A. 144 (Master ed. 1999): "[T]he Act acknowledges the right of a competent individual to decide all aspects of his or her own health care in all circumstances, including the right to decline health care or to direct that health care be discontinued, even if death ensues. An individual's instructions may extend to any and all health-care decisions that might arise and, unless limited by the principal, an agent has authority to make all health-care decisions which the individual could have made. The Act recognizes and validates an individual's authority to define the scope of an instruction or agency as broadly or as narrowly as the individual chooses."

[25]Under our law, a determination of incompetence means that the person in question has been found to lack either the physical or mental capacity to make his or her own decision regarding a particular issue. *Fazio* v. *Fazio*, 375 Mass. 394, 403 (1978). A finding of incompetence "should consist of facts showing a [person's] inability to think or act for himself as to matters concerning his personal health, safety, and general welfare, or to make informed decisions as to his property or financial interests." *Id.* A person may be adjudicated legally incompetent to make some decisions but competent to make others. *Matter of Moe*, 385 Mass. 555, 567-568 (1982). In the context of medical treatment, we have used incompetent to mean the "patient lacks the capacity to make treat-

See *Superintendent of Belchertown State Sch.* v. *Saikewicz*, 373 Mass. 728, 746 (1977) ("To protect the incompetent person within its power, the State must recognize the dignity and worth of such a person and afford to that person the same panoply of rights and choices it recognizes in competent persons"). We give effect to those rights by using a substituted judgment standard to approximate best what the incompetent person would have wanted were she able to communicate her wishes. See, e.g., *Rogers* v. *Commissioner of the Dep't of Mental Health*, 390 Mass. 489, 501-502, 512 (1983) (substitute judgment determination must be made before administration of antipsychotic drugs to incompetent patient); *Superintendent of Belchertown State Sch.* v. *Saikewicz*, *supra* at 752-753 (right of incompetent person to refuse treatment for life-threatening illness requires substituted judgment). By executing a health care proxy, a principal determines in advance that a person of her choice (rather than a judge) will make such medical decisions on her behalf. Reading into the proxy statute a restriction on her agent to act in one set of circumstances — commitment to or retention at a mental health facility where the principal does not object — would contravene the principles of individual autonomy embodied in this statute and expressed in our case law.

Bolduc argues that inferring an agent's authority to order treatment in a mental facility when the principal does not object would nevertheless effectively deprive the principal of her right not to be restrained in such a facility without due process of law. Two provisions of the proxy statute mitigate this legitimate concern. The Legislature has provided that, even after a medical determination of incapacity has been made, a principal's wishes will *always* prevail over those of her agent, unless a judicial determination of her incapacity is obtained. Thus, G. L. c. 201D, § 6, specifies:

ment decisions." *Rogers* v. *Commissioner of the Dep't of Mental Health*, 390 Mass. 489, 497, 498 (1983). Accordingly, where, as here, the medical treatment concerns commitment to a mental health facility, we look to our decisions in cases concerning the rights of incompetent patients, even though the Massachusetts proxy statute concerns individuals who lack the "capacity" to make health care decisions. See G. L. c. 201D, § 6.

"Notwithstanding a determination pursuant to this section that the principal lacks capacity to make health care decisions, where a principal objects to a health care decision made by an agent pursuant to a health care proxy *the principal's decisions shall prevail unless the principal is determined to lack capacity to make health care decisions by court order*" (emphasis added).

The statute also recognizes a principal's right to revoke the proxy, both before and after it is activated, and the principal is "presumed to have the capacity to revoke a health care proxy unless determined otherwise pursuant to a court order." G. L. c. 201D, § 7. Revocation is simple and can be accomplished by "notifying the agent or a health care provider orally or in writing or by any other act evidencing a specific intent to revoke." *Id.* The principal need not know that revocation of the proxy would prevent commitment to a mental health facility; objection by the principal to *any* treatment decision of the agent — including commitment to or retention at a mental health facility — requires nothing more than signifying her objection. It is as simple as saying "no."[26]

Bolduc's proxy placed no limitation on her agent's authority; it specifically authorized her agent to hospitalize her. There is no reason to infer that at the time she executed the proxy, Bolduc did not wish to convey to her agent the power to commit her to a mental health facility, should the agent deem it in her best interests. There is no indication in the record that Bolduc protested her admission to the hospital, nor any indication that she objected to her hospitalization during the first thirty-five days of her treatment. We would fail to respect Bolduc's own "right," G. L. c. 201D, § 2, to make treatment decisions through a proxy of her choice were we to read into the statute a restriction on her agent's authority to commit her to a mental health facility. The motion judge properly determined

---

[26]We also note that G. L. c. 201D, § 17, permits a wide range of persons, including the principal's health care provider, members of her family, and a close friend, among others, to commence a proceeding to override the agent's decision should any one of these persons believe that any treatment decision, including the decision to admit or retain the principal at a mental health facility, is made in bad faith or is not in accordance with the principal's best interests. G. L. c. 201D, § 17 (iii).

that a health care proxy agent does have the authority to commit a principal to a mental health facility, provided the principal does not object.

3. *Commitment to a mental health facility where the principal objects to treatment.* The respect for individual autonomy and self-determination that is reflected in the proxy statute and that has shaped our jurisprudence requires that we honor the desires of an individual expressed in her health care proxy. The right to refuse medical treatment is founded on those same values, and the Legislature has made clear that a principal retains her right of self-determination concerning medical treatment she chooses not to receive. Thus, even after a proxy has been activated, the principal may disagree with her agent, in which event "the principal's decisions shall prevail." G. L. c. 201D, § 6. The principal may also revoke her proxy at any time. G. L. c. 201D, § 7. In both cases the agent has no further authority to make treatment decisions, including the commitment or retention of the principal at a mental health facility, without judicial intervention. See G. L. c. 201D, §§ 6, 7. Where there is disagreement between the principal and her agent, on application to affirm the agent's authority over the principal, the statute directs a judge to determine whether the principal "lacks capacity to make health care decisions." G. L. c. 201D, § 6. Where there is revocation, the principal is "presumed" to have the capacity to revoke her proxy "unless determined otherwise pursuant to court order." G. L. c. 201D, § 7.

In this case, when the hospital received Bolduc's written notice that she had revoked her proxy and that she wanted to leave the hospital, see note 7, *supra,* the hospital correctly determined, in its words, that it had "no further legal authority to retain her at [its] facility." It thereupon immediately filed a petition for involuntary civil commitment, G. L. c. 123, §§ 7, 8, and sought judicial permission to retain Bolduc against her will. In so doing the hospital's treating physician represented to the court that he had determined that failure to hospitalize Bolduc would create a likelihood of serious harm by reason of mental illness, and provided the court with reasons for his diagnosis. See G. L. c. 123, § 7. A judge in the District Court thereafter

found that Bolduc was mentally ill and that her discharge from the hospital would create a likelihood of serious harm, as required by G. L. c. 123, § 8. See notes 9 and 10, *supra.*

In the circumstances of this case, therefore, Bolduc's argument that she was denied due process of law in connection with her retention at the hospital fails: she received adequate process to protect her rights to refuse medical treatment. See *Doe* v. *Doe*, 377 Mass. 272, 280-281 (1979); *Superintendent of Belchertown State Sch.* v. *Saikewicz*, 373 Mass. 728, 746, 752-753 (1977). Because the hospital proceeded under the involuntary commitment statute, there was no need for a judicial determination of Bolduc's "incapacity" under G. L. c. 201D, §§ 6 or 7. We therefore need not and do not decide whether commitment over Bolduc's objection would have contravened G. L. c. 201D, G. L. c. 123, §§ 7 and 8 (involuntary commitment), or any other provision of law had the hospital not proceeded as it did.

The judge's order denying the motion to dismiss is affirmed.

*So ordered.*